IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RUDOLPH HENRY, et al., | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA, et al., | : | NO. 09-1584 |
| Defendants. | : | |

## MEMORANDUM OPINION

DAVID R. STRAWBRIDGE                                          September  30, 2010
UNITED STATES MAGISTRATE JUDGE

## I.      INTRODUCTION

Rudolph Henry and Ruth Henry, husband and wife ("Plaintiffs"), brought this action individually and as co-administrators of the estate of their deceased son, Jason Henry ("Henry"), seeking compensatory and punitive damages against Philadelphia Police Officer Daniel Zorawski, Police Officer George Orth, Police Sergeant Christopher Bradshaw, and Police Sergeant Joseph Schiavone (the "Defendant Officers"), as well as the City of Philadelphia (the "City").  Plaintiffs' claims relate to the police response to Mrs. Henry's request for assistance at her home on August 5, 2007 in light of her son's bizarre and violent behavior.  The encounter culminated in Sergeant Bradshaw employing a Taser in an effort to subdue Henry and Officer Zorawski then firing the shots that killed him.  Plaintiffs have asserted federal claims against the Defendant Officers and the City under 42 U.S.C. § 1983 and additional state law claims against Zorawski only.

The parties consented to magistrate judge jurisdiction.  Presently before the Court is the motion of the Defendant Officers seeking summary judgment on all claims brought against them.

1

For the reasons set forth below, we will grant this motion in part and deny it in part, permitting Plaintiffs to pursue claims only against Sergeant Bradshaw and Officer Zorawski.

## II.    FACTUAL BACKGROUND[1]

Ruth Henry called 911 at approximately 11:13 a.m. on August 5, 2007, requesting police assistance at her home at 6883 N. 19th Street in Philadelphia.  Upon their arrival at about 11:22 a.m., Officers Patrick Delany and Christopher Hearn found Mrs. Henry outside the residence.  She explained to them that she had "called the cops" because her son was "on something" and had tried to "attack" her with a scale, which prompted her to run outside even though she was barefoot. (Delany Dep. [Pl. Ex. B] at 19-22.).  Officers then observed Henry walk out of the back door of the house, through the "breezeway" that separated the Henry house from a neighboring house, and toward 19th Street.  When he reached the top of a set of steps that led down to the sidewalk, he threw a hatchet, a knife, and a spackling knife at the officers, one of whom was only 10 to 12 feet away. (Delany Dep. [Pl. Ex. B] at 40-48.)  Hearn and Delany hit their "assist buttons," and Hearn reported on the Police Radio that someone was throwing an axe and knives at them.  (Delany Dep. [Pl. Ex. B] at 42-43; Police Transmissions, 8/5/07 [Pl. Ex. C] at 11:38.10 a.m.)  Hearn then tried to apprehend Henry, but Henry slapped him in the face with his shoe and ran back into the house. (Delany Dep. [Pl. Ex. B] at 48-51.) Over the next ten minutes, various other officers arrived on the scene.  One later described Henry as appearing "out of it" or "high on something."  (Hummel Dep. [Pl. Ex. F] at 32.)  When Sergeant Bradshaw arrived on the scene, he was advised by Mrs. Henry that her son "may have been under the influence of drugs."  (Bradshaw Dep. [Pl. Ex. G] at 22.)  Around

---

[1] We rely here upon the documents and deposition testimony provided by Plaintiffs in their opposition to Defendants' motion.  *See* Doc. No. 42.  *See also* note 5, *infra*.

this time, Henry threw a hammer and a cordless drill from a second-story window at two officers positioned at the rear of the house. (Hummel Dep. [Pl. Ex. F] at 13-14, 17, 53-54; Delany Dep. [Pl. Ex. B] at 50-52.)

At 11:49 a.m., one of the sergeants on the scene, Christine McShea, declared a "Barricaded Person" situation pursuant to Philadelphia Police Department Directive 111.[2] (Phila. Police Dept. Mem. re: PS# 07-51, dated 9/2/08 [Pl. Ex. K (excerpts)], at 2.) In light of the barricade designation, Defendant Sergeant Bradshaw directed officers to "clear out," away from the "zone of protection" that is designated by the Directive. Nonetheless, four officers who were present at the scene — Defendants Sergeants Bradshaw and Schiavone and Officers Orth and Zorawski — remained in the breezeway area to "keep an eye on [Henry]" because he continued to carry a knife and "kept coming to the window" and the door. (Bradshaw Dep. [Pl. Ex. G] at 28.) While awaiting the arrival of the SWAT team and crisis negotiators, Orth continued to speak with Henry, "trying to calm him down" and "keep him under control." (*Id.* at 34, 43.) When Orth asked Henry to put his knife down and come out, however, Henry responded that "there [were] a lot of cops out there and that he "[was] not coming outside." (Bradshaw Dep. [Pl. Ex. G] at 45.) Plaintiff's evidence indicates that other officers may also have communicated with Henry during this time. *See* Czepiel Stmt., 9/5/07 [Pl. Ex. L] (reporting that Bradshaw, Shiavone, and Orth were talking to Henry to "have him come out"); Phila. Police Dep't Mem. re: Police Shooting #07-51, 9/2/08 [Pl. Ex. K] at 2 (reporting that "[a]t

---

[2] This Directive concerns "Crisis Response / Critical Incident Negotiations" and is intended "to instruct police personnel in the proper tactics and procedures in order to remove" a "barricaded person," a "hostage taker," or a "severely mentally disabled person," and to "safeguard the personal well-being of all concerned." (Phila. Police Dep't Directive 111 (7-3-01) [Pl. Ex. J] at 1.) The directive instructs officers on the scene of a barricaded person to, *inter alia*, "[t]ake defensive measures and attempt to maintain an appropriate 'zone of protection,'" to "[a]void placing themselves in a position that requires taking unnecessary or overly aggressive actions." (*Id.* at 4-5.)

various times, Sgt. Bradshaw, Sgt. Schiavone, and P/O [sic] Orth attempted to persuade Henry to come outside and surrender).

Henry emerged from the front door at 11:56 a.m. and stood on the landing at the top of the steps leading to the breezeway area. (Phila. Police Dep't Mem. re: PS #07-51 [Pl. Ex. K] at 2.) Bradshaw had positioned himself near the door so that, "if [Henry] came out with the knife, [Bradshaw] would shoot him with the taser." (Bradshaw Dep. [Pl. Ex. G] at 49, 63.) According to Plaintiffs' witnesses, who observed from across the street, Henry had his left hand up in the air and had a cell phone in his right hand, which he held to his right ear. They assert that he did *not* have a knife in his hand. (Ruth Henry Aff., 4/13/10 [Pl. Ex. N] at ¶¶ 5-8; Bernadette Williams Aff., 4/13/10 [Pl. Ex. O] at ¶¶ 6-9. *See also* Antoinette Jackson Aff., 4/22/10 [Pl. Ex. P] at ¶¶ 6, 9 (stating that Henry's hands were over his head when he walked out of the house and that "[i]t looked to [her] that Jason Henry was unarmed and trying to surrender when he walked out of his house").)[3] Bradshaw and the other three Defendant Officers were all within six feet of Henry when he stood near the top of the steps leading from the front door. (Delany Dep. [Pl. Ex. B] at 79-80.) Just after Henry walked out, Sgt. Bradshaw employed the Taser on him from a distance of less than ten feet. (Bradshaw Dep. [Pl. Ex. G] at 52-57, 63-64. *See also* Ruth Henry Aff. [Pl. Ex. N] at ¶¶ 9-10 (reporting that she heard the loud buzz of the Taser "almost immediately after Jason stepped out of the entrance").) Henry fell onto the front door steps. (Ruth Henry Aff. [Pl. Ex. N] at ¶ 10.) Several officers rushed towards him and, "almost immediately thereafter," several shots were fired. (*Id.* at

---

[3] Whether or not Henry was holding a knife in his right hand when he emerged from the house at 11:56 is a highly-contested fact. *See, e.g.,* Bradshaw Dep. [Pl. Ex. G] at 52-54 (describing that he employed Taser when Henry opened the storm door and walked out a few steps with a knife in his hand and after telling him to "put the knife down").

4

¶¶ 11-12.)  The police department's subsequent investigation of the incident confirmed that Officer

Zorawski fired his weapon seven times and that Henry was struck multiple times.  (Phila. Police

Dept. Mem. re: PS#07-51, dated 9/2/08 [Pl. Ex. K], at 2.)  The police transported Henry to the

hospital but he was pronounced dead a short time later.  (*Id.*)  Following upon its investigation, the

police department concluded that after Henry was shot with the Taser and fell, he got up and came

toward Officer Orth with a knife in his hand; that Orth pushed him away, but he then came towards

Officer Zorawski with the knife still in his hand; and that Zorawski blocked his knife with one hand

and drew his gun with the other and fired upon Henry.  (*Id.* at 8.)

## III.    PROCEDURAL HISTORY

Plaintiffs timely filed suit against the City and unknown officers, but subsequently amended

their complaint to state claims against the four Defendant Officers.  (Doc. No. 9.)  Set out in the

amended complaint are:

•       Counts I and II: § 1983 claims against Officer Zorawski for deprivation of Fourth and

Fourteenth Amendment rights based upon Zorawski having shot Henry (Am. Compl. ¶¶ 51-64);[4]

•       Counts III and IV: § 1983 claims against Officer Orth for deprivation of Fourth and

Fourteenth Amendment rights based upon Orth having allegedly induced Henry to come out of

Plaintiffs' residence and thereby exposing him to force by the police (Am. Compl. ¶¶ 65-79);

---

[4] Plaintiffs bring two counts against each of the officers based upon the type of damages sought.  They refer in the caption of each count either to a "wrongful death action" or a "survival action."  The counts seek different measures of damages, either on behalf of Henry or as his surviving parents, but do not differentiate the claims as between the Fourth and Fourteenth Amendments.  All claims against the Defendant Officers were brought in both their individual and official capacities.  (Am. Compl. ¶ 13.)

•      Counts V and VI: § 1983 claims against Sergeant Bradshaw for deprivation of Fourth and Fourteenth Amendment rights relating to Bradshaw having allegedly induced Henry to come out of Plaintiffs' residence and for deploying a Taser gun on him (Am. Compl. ¶¶ 81-94);

•      Counts VII and VIII: § 1983 claims against Sergeant Schiavone for deprivation of Fourth and Fourteenth Amendment rights based upon Schiavone having allegedly induced Henry to come out of Plaintiffs' residence (Am. Compl. ¶¶ 95-109);

•      Counts IX and X: § 1983 claims against the City for deprivation of constitutional rights and privileges due to the City's alleged failure to train, supervise, control and discipline officers and its alleged tolerance of improper customs and practices of its officers (Am. Compl. ¶¶ 110-22); and

•      Counts XI and XII: state law claims against Officer Zorawski for assault and battery (Am. Compl. ¶¶ 123-38).

Pursuant to a revised scheduling order issued on March 1, 2010, the Court bifurcated the discovery and briefing schedule with respect to Plaintiffs' claims against the City and the Defendant Officers. (Doc. No. 39.) In accordance with that order, as revised, the Defendant Officers filed their motion for summary judgment on March 26, 2010. (Doc. No. 40.)[5] Plaintiffs filed their memorandum of law in opposition, with supporting exhibits, on April 26, 2010. (Doc. No. 42.) The Defendant Officers filed a reply brief on May 10, 2010. (Doc. No. 44.) After obtaining leave of

---

[5] Defendants did not include with their motion any supporting documentation. *See* Explan. & Order, 5/12/10 (Doc. No. 45) (noting that Defendants' summary judgment filings refer to exhibits but that none were appended). The Court brought this omission to the attention of defense counsel and provided counsel an opportunity to submit the exhibits that were referred to in the motion. *See id.* (providing final opportunity for defense to file exhibits by May 17, 2010). Defendants did not, however, avail themselves of that opportunity. *See* Docket, Civ. A. No. 09-1584 (reflecting no filing by Defendants in response to May 12, 2010 order).

We note also that Defendants' filing lacks page numbers. We will refer to the pages of the submission by the pagination added to the filing by the PACER system.

court, Plaintiffs filed a sur-reply on May 14, 2010.  (Doc. No. 46.)  The matter is now ripe for review.[6]

## IV.    SUMMARY JUDGMENT STANDARD

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2) (Dec. 1, 2009). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it could be said to affect the outcome of the case under governing law.  *Id.*  The moving party bears the initial burden of "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  In order to successfully oppose a properly supported motion, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)).  In reviewing the summary judgment record, "a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Armbruster v. Unisys Corp.,* 32 F.3d 768, 777 (3d Cir. 1994).  The

---

[6] In accordance with the revised scheduling order, following the resolution of this motion and as may be necessary, the Court will establish a schedule for completion of any additional fact discovery and will set a deadline for any dispositive motion the City may wish to file with regard to Plaintiffs' claims against it.  Previously scheduled deadlines in this matter, as well as a date for trial, have already been suspended pending the resolution of this motion and the further discovery that the parties intended to conduct.

court may not make credibility determinations or weigh the evidence in reaching its conclusion. *See*

*Anderson*, 477 U.S. at 255 (observing that these are jury functions).

## V.    DISCUSSION

In their response to the summary judgment motion, Plaintiffs have clarified the particular

theories of relief upon which their federal claims are premised as to each of the four Defendant

Officers.[7]    Against Defendant Officer Zarowski, who fatally shot Henry, Plaintiffs assert a claim

based upon the use of allegedly excessive force in violation of Henry's Fourth Amendment right to

be free from unreasonable seizures.    Against Defendant Sergeant Bradshaw, who employed the Taser

on Henry, Plaintiffs similarly assert a claim of excessive force in violation of the Fourth

Amendment.    Plaintiffs also assert against Sergeant Bradshaw a claim premised on the due process

provision of the Fourteenth Amendment based upon a state-created danger theory and relating to

Bradshaw's alleged role in coaxing Henry out of the house, leading to the deployment of deadly

force in his seizure.    Against both Defendant Officer Orth and Defendant Sergeant Schiavone,

Plaintiffs bring only this due process, Fourteenth Amendment claim, again based upon a state-created

danger theory.    *See* Pls.' Mem. of Law in Opp. to Summ. Jmt. at 31 (explicitly disavowing a

---

[7] We observe here that the Defendant Officers' motion purports to seek summary judgment on *all* claims made against them by Plaintiffs. *See* Mem. in Supp. of Summ. Jmt. and Prop. Order (Doc. No. 40 at 1, 3.) However, Plaintiffs have also asserted claims against Officer Zorawski based upon state law assault and battery principles (Counts X and XI of the Amended Complaint) — which Defendants do not touch upon in their motion. *See* Mem. in Supp. of Summ. Jmt. (Doc. No. 40 at 11) (focusing entirely on the question of the "support [for] a claim that Defendant Officers deprived Plaintiffs of a right protected by the Constitution"). *See also id.* (Doc. No. 40 at 11, 15, 17) (discussion section headings all focusing on federal civil rights claims or qualified immunity defense available for federal claims); Pls.' Mem. in Opp. to Summ. Jmt. at 31 n.11 (Doc. No. 42) (observing that Defendants failed to discuss the state law claims in their moving papers).    Those state law claims are not affected by the resolution of this motion.

characterization by Defendants that all of Plaintiffs' § 1983 claims arose under the Fourth Amendment).

The Defendant Officers assert, however, that all of Plaintiffs' claims should be measured against the standards of the Fourth Amendment, in that all of the challenged conduct related to an arrest. They further contend that all of the claims fail under that standard in light of circumstances that they contend justified the use of force. Alternatively, they assert that any claims that might be considered under the Fourteenth Amendment fail because, *inter alia*, the defendants' conduct was not conscience-shocking and because they did not increase the risk of harm to Henry. Finally, the Defendant Officers contend that Plaintiffs' claims against them fail as a matter of law under the doctrine of qualified immunity.

We first consider the claims against Sergeant Bradshaw and Officer Zorawski as to which, the parties agree, the officers' actions must be judged in light of the Fourth Amendment's reasonableness standard. We then address the additional claims, against Sergeants Bradshaw and Schiavone and Officer Orth, relative to conduct that did not involve the application of physical force, considering first the question of the officers' entitlement to qualified immunity.

### A.     Fourth Amendment excessive force claims: Bradshaw and Zorawski

#### 1.     Legal standards

The application of force against a citizen by a state actor implicates the Fourth Amendment right of individuals "to be secure in their persons . . . against unreasonable . . . seizures." U.S. Const., Amend. IV. The Supreme Court has made explicitly clear that the Fourth Amendment "reasonableness" standard applies to all claims that law enforcement officers have used excessive force "in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen." *Graham v.*

*Connor*, 490 U.S. 386, 395 (1989). *See also id.* at 395 n.10 (citing *Terry v. Ohio*, 391 U.S. 1, 19 n.16 (1968), for the proposition that a Fourth Amendment "seizure" occurs when government actors have, "by means of physical force or show of authority, . . . in some way restrained the liberty of a citizen"). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interest against the countervailing governmental interests at stake." *Id.* at 396 (citations omitted). *See also Tennessee v. Garner*, 471 U.S. 1, 8 (1985) (citing precedents showing that "the balancing of competing interests" is "the key principle of the Fourth Amendment"). The proper application of the reasonableness test "requires careful attention to the facts and circumstances of each particular case[.]" *Graham*, 490 U.S. at 395. Some factors that the *Graham* Court suggested might be relevant included: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 395. Nonetheless, "the inquiry . . . is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397.

With respect specifically to the use of deadly force — e.g., shooting a gun — the Supreme Court has determined that such force may be deemed reasonable only if necessary to prevent the escape of a subject who poses a significant threat of death or serious physical injury to the officer or to someone else. *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). "Thus, if the suspect threatens the

officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Garner*, 471 U.S. at 11-12. However, "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead." *Id.* at 11. Employing the balancing test, the *Garner* Court recognized that "[i]t is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Id.*

### 2. Reasonableness of Bradshaw's seizure of Henry with the Taser

Defendants contend that "Bradshaw's use of a [T]aser in this matter is clearly reasonable based on the facts and circumstances that he was confronted with outside of [t]he [h]ouse on August 5, 2007," and that Bradshaw only used the Taser when it was clear that Henry was defiant and an imminent threat. (Def. Br. at 13.) The "facts and circumstances" to which Defendants cite are: (1) Bradshaw's awareness that Henry had thrown a hatchet and knives at police officers, which gave rise to the reasonable conclusion that Henry was a danger to Bradshaw and the other officers; (2) the "fact" that Henry was holding a knife and refusing direct orders to drop it when he exited the house; and (3) the "fact" that Henry continued to move toward Bradshaw and the other officers with a knife. (Def. Br. at 13.) However, the second and third "facts" are contested by Plaintiffs, who have pointed to evidence which, if credited by the jury, would support the conclusion that Henry was not armed when he stepped out of the house in response to the officers' instructions that he come out and that he did not move toward the officers with a knife, or in any manner that could be deemed threatening, when Sergeant Bradshaw employed the Taser.

11

It is undisputed that Officer Bradshaw used force by deploying his Taser on Henry while he stood at the top of the front steps leading from the house to the breezeway. His exit from the house followed upon an officer's instructions that he drop his knife and come out of the house. He was not charging at officers when he first stepped out nor did he display any intent to flee. Given the factual issues in dispute regarding whether he was armed at the time he emerged, the question of whether the force employed by Bradshaw was objectively reasonable under the circumstances must be left for the jury. This conclusion is consistent with that of many other courts within this circuit when presented at the summary judgment stage with a conflicting or close factual record regarding the circumstances surrounding the use of this sort of force. *See, e.g., Wilhere v. Delaware County*, Civ. A. No. 09-22, 2010 WL 1381664, *6-7 (E.D. Pa. Apr. 1, 2010) (McLaughlin, J.) (denying officers' summary judgment motion where reasonable jury could conclude that use of Taser was unreasonable in light of plaintiff's passive resistance when arrested on picket line); *Buchanan v. West Whiteland Twp.*, Civ. No. 08-462, 2009 WL 54949, *3 (E.D. Pa. Jan. 7, 2009) (Hart, M.J.) (denying summary judgment due to disputed facts regarding plaintiff motorist's actions leading up to use of Taser); *Shultz v. Carlisle Police Dep't*, Civ. A. No. 08-1896, 2010 WL 433124, *5-6 (M.D. Pa. Apr. 7, 2010) (denying summary judgment where videos suggested officers had plaintiff under control when employed Taser, despite earlier resistance of their efforts to place him on gurney following behavior in restaurant consistent with seizure or intoxication and without having committed any crime). Accordingly, we will deny summary judgment on the Fourth Amendment claim brought against Officer Bradshaw.

### 3.    Reasonableness of Zorawski's seizure of Henry with deadly force

Defendants also contend that "Zorawski's use of deadly force . . . [was] clearly reasonable based on the facts and circumstances that he was confronted with outside of [t]he [h]ouse on August 5, 2007," and that "no reasonable finder of fact could determine that [Zorawski's] conduct was unreasonable." (Def. Br. at 14.)  "The only reasonable interpretation of the facts and circumstances," Defendants assert, "is that Henry posed a significant threat."  (*Id.*)  Specifically, Defendants assert that Henry "charged towards him swinging and slashing a large knife," "pinned [Zorawski] up against a wall, attempted to stab him, and was able to get his knife within inches of Zorawski's neck and vital organs."  (*Id.*)

Plaintiffs present a different version of the facts, which goes to the believability of Officer Zorawski's contention that Henry came at him with a kitchen knife.  As discussed above, Mrs. Henry and her sister, Ms. Williams, have stated in their affidavits that they observed the scene from the street and that they saw Henry's left hand in the air and his right hand holding a cell phone to his ear when he emerged from the house.  They contend that he did not have a knife.  Another witness from across the street stated that Henry appeared to her to be unarmed when he stepped out of the house. *See* Pl. Exs. N-P.  Plaintiffs also suggest that the physical evidence collected at the scene undermines the officers' version of events and corroborates theirs: while Officer Delany testified that Henry had thrown a kitchen knife (along with a spackling knife) at him much earlier, only one "kitchen knife" was recovered from the scene following the incident.  *See* Pl. Br. at 9 n.9 (citing Delany Dep. [Pl. Ex. B] at 40-48).  In addition, Mrs. Henry and Ms. Williams suggest that Henry did not charge after any officers but that he stumbled down the steps after being Tasered and was then rushed by several officers, "almost immediately" after which he was shot.

13

A jury could well find the facts to be as Defendants suggest and further find Zorawski's actions not unreasonable under those circumstances. However, we cannot say that "the only reasonable interpretation of the facts and circumstances" (Def. Mot. Summ. Jmt. at 14) is the version presented by Defendants and that no reasonable jury, applying the law to their factual findings, could determine the officer's actions to constitute excessive force under the totality of the circumstances. Rather, we conclude that Plaintiffs have pointed to sufficient evidence from which a jury could reasonably conclude that Henry was not armed when he emerged from his house and arose after collapsing from the Taser shot and that he did not charge or threaten any of the officers. If the jury finds those facts, it could reasonably conclude that Officer Zorawski's shooting of Henry was a display of excessive force and violated his Fourth Amendment rights. In light of the factual dispute as to the highly material question of whether or not Henry was brandishing a knife and charged the officers when he jumped up after being Tasered, summary judgment is not appropriate.

**B.      Qualified immunity as to Fourth Amendment claims against Bradshaw and Zorawski**

Alternatively, the moving Defendants assert that they should be granted summary judgment as a matter of law as to all of the § 1983 claims against them on the grounds of qualified immunity because "there [was] no clearly established law prohibiting" their conduct. *See, e.g.,* Defs. Mot. for Summ. Jmt. at 19 (Zorawski), 21 (Bradshaw). It is appropriate for us to consider, therefore, the propriety of their asserted right to qualified immunity as to these claims for which a sufficient factual basis exists in the record.

The doctrine of qualified immunity provides that government officials are immune from suits for civil damages under 42 U.S.C. § 1983 "insofar as their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Determining whether the defendants are entitled to qualified immunity requires two inquiries, which can be taken in either order: (1) "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right," and (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 190 S. Ct. 808, 816, 818 (2009). Even if the court determines that the plaintiff could demonstrate a constitutional violation, the defendant receives the benefit of qualified immunity if that constitutional right was not, at the time of the violation, sufficiently established such that a reasonable officer would have realized that he was engaging in a constitutional violation.

As to the claims against Sergeant Bradshaw and Officer Zorawski, Defendants' assertions of qualified immunity are premised upon the version of disputed facts most favorable to them: (1) that when Sergeant Bradshaw employed his Taser, Henry was holding a knife and refused direct orders to drop it, and (2) that when Officer Zorawski employed deadly force, Henry was attempting to stab or slash him from within a close range. (Defs. Mot. Summ. Jmt. at 19, 21.) Those facts, however, have not been established. At this stage, we give Plaintiffs the benefit of the facts most favorable to them: (1) that Henry was unarmed when he stepped out of the house as instructed by Defendants, and (2) that he represented no threat to the life of any of the officers when Zorawski shot him. Defendants do not cite to any cases suggesting that a reasonable officer would have believed it was acceptable under the Constitution to employ a Taser to seize someone who had previously been behaving erratically but who complied with a police directive to drop his knife and come out of the house. Nor do they cite to any authorities that would have given Zorawski reason to believe it was acceptable to shoot Henry if he was not armed with a deadly weapon. The issue of qualified

immigrant here again requires resolution of factual disputes by a jury. *See Monteiro v. City of Elizabeth*, 436 F.3d 397, 405 (3d Cir. 2006); *Horton v. City of Harrisburg*, Civ. A. No. 1:06-cv-2338, 2009 U.S. Dist. LEXIS 63428, *10 n.4 (M.D. Pa. July 23, 2009); *Estevez v. City of Philadelphia*, Civ. A. No. 06-3168, 2007 U.S. Dist. LEXIS 14962, *5 n.3 (E.D. Pa. Mar. 2, 2007). Accordingly, we conclude that Plaintiffs' claims of a Fourth Amendment violation by Sergeant Bradshaw and Officer Zorawski may go forward.

### C. Claims against Bradshaw, Orth, and Schiavone relating to "luring" out of house

Defendants also seek summary judgment on the aspects of the claims against Officer Orth and Sergeants Schiavone and Bradshaw that seek § 1983 relief for their alleged "coercing, compelling, causing and/or inducing [Henry] to come out of Plaintiffs' residence to surrender to the police." *See, e.g.,* First Am. Compl. ¶¶ 66 (Orth), 81 (Bradshaw), 96 (Schiavone). They assert that any claims brought under the Fourteenth Amendment must be dismissed and that the claims must instead be measured against Fourth Amendment reasonableness standards. (Defs. Mot. Summ. Jmt. at 11.) They contend that Fourth Amendment claims against Officer Orth and Sergeant Schiavone fail as a matter of law because these officers did not themselves apply any force against Henry and because they cannot be held liable for the action of fellow officers, even if they were found to have "unreasonably precipitated the need to use deadly force." (Defs. Mot. Summ. Jmt. at 11-13.) In the alternative, Defendants assert that an analysis of Plaintiffs' claims under the Fourteenth Amendment state-created danger theory would also require summary judgment, either because they believe that some of the officers did not do anything to induce Henry to exit the house (Defs. Mot. Summ. Jmt. at 15-16) (arguing as to Sergeants Schiavone and Bradshaw), or because the conduct of the one who concededly did act — Orth — was not sufficiently conscience-shocking. (Defs. Mot. Summ. Jmt.

at 16-17.)  In addition, they assert qualified immunity as a defense to these claims.  (Defs. Mot. Summ. Jmt. at 17-19, 21-22.)

In response, Plaintiffs contend that the claims against Officer Orth and Sergeants Schiavone and Bradshaw that relate to the inducement of Henry to emerge from the house are viable under the Fourteenth Amendment state-created danger theory.[8]  They suggest that the conduct of the three officers created a risk of foreseeable harm to Henry and that the situation is thus akin to the various Fourteenth Amendment due process cases in which state officers were found to have created a risk and a third party then caused foreseeable harm or foreseeable harm otherwise resulted.  They also contend that their Fourteenth Amendment rights in this regard were sufficiently clearly established that Defendants should not have the benefit of qualified immunity.  (Pls. Opp. to Mot. Summ. Jmt. at 31, 33-34, 40-41.)  In this section, we begin with Defendants' assertion of qualified immunity.

### 1.    Qualified immunity: Would reasonable officers have believed that their conduct violated Henry's constitutional rights in light of prior case law?

As discussed above, officers are not liable to a § 1983 plaintiff and are immune from suit if, even though they may have engaged in conduct that violated a constitutional right, the outlines of the right at issue were not, as of the time of their actions, "sufficiently clear that a reasonable officer would understand that his actions violate the right."  *Sterling v. Borough of Minersville*, 232 F.3d

---

[8] We note that Plaintiffs had alleged in their pleadings that the actions of Officer Orth and Sergeants Bradshaw and Schiavone  "caused [Henry] to suffer a deprivation of certain rights and privileges secured and protected by the Fourth and Fourteenth Amendments," "including the right to be free from the unlawful seizure of his person and the right to be secure in his person."  First Am. Compl. ¶¶ 66 (Orth), 81 (Bradshaw), 96 (Schiavone).  This would appear to state a Fourth Amendment Claim.  *Cf.* U.S. Const., Amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . .").  However, Plaintiffs' papers opposing summary judgment make it quite clear that they intended to pursue a Fourth Amendment claim only against Sergeant Bradshaw and Officer Zorawski.

190, 193 (3d Cir. 2000). The Supreme Court has suggested that the contours of a right may be "clearly established" for purposes of the qualified immunity assessment by cases of controlling authority in the jurisdiction or by "a consensus of cases of persuasive authority." *Wilson v. Layne*, 526 U.S. 603, 617 (1999). The assessment of the extent to which the right has been established must be made "in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). A right will be considered clearly established, and qualified immunity will therefore not be available to the defendant official, in cases involving a violation of a general constitutional rule that applies "with obvious clarity to the specific condition in question, even though the very action in question has [not] previously been held unlawful." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

With respect to Defendants' assertion of qualified immunity, Plaintiffs take the position that they are "not required to point to an earlier case with precise factual similarities" in order for the defendant to be found to have violated "clearly established law." (Pl. Br. at 40.) Rather, they point to the fact the state-created danger due process theory was clearly established in the Third Circuit as far back as 1998 and cite to cases for the proposition that general statements of law can provide fair warnings that conduct is unlawful. *Id.* (citing *Diamond v. City of Philadelphia*, Civ. A. No. 07-1258, 2007 U.S. Dist. LEXIS 87646, *9-*10 (E.D. Pa. Nov. 28, 2007) (Diamond, J.), and *Bennett v. Murphy*, 120 Fed. Appx. 914, 918 (3d Cir. 2005)). The cases cited by Plaintiffs, however, involved claims under the Fourth Amendment in which the defendants' alleged conduct involved the application of force in circumstances that we would find would more obviously have given a reasonable officer pause. *See, e.g., Diamond*, 2007 U.S. Dist. LEXIS 87646 at *10 (officer struck occupant of house that was being searched and when occupant posed no danger to officer and was

not a suspect); *Bennett*, 120 Fed. Appx. at 918 (officer shot armed distraught man who had refused to drop his weapon over the course of an hour-long standoff but who had never pointed his single-shot shotgun at anyone but himself and was not in flight at the time he was shot, and notwithstanding that other officers were positioned closer to scene).

We recognize that "the very action in question" need not have been previously held unlawful in order for a right to be considered clearly established such that an officer would be expected to appreciate the constitutional implications of his actions. *See United States v. Lanier*, 520 U.S. 259, 271 (1997) (applying in context of vague criminal statute). *See also Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (prior cases in circuit involving other forms of corporal punishment of inmates established right to be free from being handcuffed to hitching post during work detail as "clearly established," although "[a]rguably, the violation was so obvious that [the Supreme Court's] own Eighth Amendment cases gave respondents fair warning that their conduct violated the Constitution"). At the same time, in other circumstances, such as "when an earlier case expressly leaves open whether a general rule applies to the particular type of conduct at issue, a very high degree of prior factual particularity may be necessary." *Lanier*, 520 U.S. at 271.

Plaintiff has failed, however, to direct our attention to cases that would show, in a "more particularized, and hence, more relevant sense," *see Anderson v. Creighton*, 483 U.S. 635, 639 (1987), that the right they suggest was violated here by the "inducing" or "luring" of Henry by Defendants was "clearly established" as of August 5, 2007. In contrast to the cases cited by Plaintiffs with more obvious facts, either in the Fourth Amendment context or the state-created danger theory, the constitutional implications of the officers' allegedly improper conduct here — directing Henry to put his knife down and come out — were not so clear. This directive, in aid of

19

arresting Henry and ensuring that he was no longer a danger to himself or others, is unlike the actions of the officials that had been held to violate the subject's constitutional rights in the cases cited by Plaintiffs. *See, e.g., Kneipp v. Tedder*, 95 F.3d 1199 (3d Cir. 1996) (officers stopped husband and wife, permitted husband to walk home in circumstances suggesting they would take wife to police station or hospital; officers then abandoned very inebriated wife to walk home alone and sustain injuries in fall); *Rivas v. City of Passaic*, 365 F.3d 181 (3d Cir. 2004) (paramedics falsely told police that patient had attacked them and failed to communicate that patient was experiencing seizure requiring special precautions when police arrested and transported him).

When we consider the cases that are the closest to the facts confronting the Defendant Officers when they allegedly lured Henry out of the house, we find that, "in light of pre-existing law," any unlawfulness of their conduct would *not* have been "apparent" to them and that "the contours of the right" would *not* have been "sufficiently clear that a reasonable official would understand that what he [was] doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). We found the following four cases to present facts closest to those confronting Officer Orth and Sergeants Bradshaw and Schiavone when they are alleged to have lured Henry out of the house. While not uniform in their approach, we find them to demonstrate that a "consensus of cases of persuasive authority," *Wilson v. Layne*, 526 U.S. 603, 617 (1999), had not clearly established the right that Plaintiffs seek to advance here.

### a. *Estate of Smith v. Marasco*

The Third Circuit twice decided appeals in the case of *Estate of Smith v. Marasco*: 318 F.3d 497 (3d Cir. 2003), and 430 F.3d 140 (3d Cir. 2005). The litigation arose from the police response to a call from a neighbor of Mr. Smith, with whom Smith had had previous disputes, accusing Smith

of shining a bright light into his backyard. When the police were on Smith's property hoping to locate him to discuss the matter, an officer came to believe that a laser sight from a firearm was aimed at a fellow officer. The police retreated and then called in the special emergency response team. Although officers learned that Smith had heart problems and suffered from flashbacks to the Vietnam War, after several hours without any contact with Smith, they stormed Smith's house and nearby shed with flash-bang devices and tear gas. The Third Circuit found that this response could be deemed excessive and in violation of Smith's constitutional rights and that the officers were not entitled to summary judgment. *Smith*, 430 F.3d at 151-52.[9] Apart from the entrance into the house and shed, which the court evaluated under the Fourth Amendment, the court also considered whether other conduct of the officers could have given rise to liability under the Fourteenth Amendment. The court concluded, however, that reasonable officers would not have had "fair warning" in light of the court's precedents that their conduct in forming an initial perimeter around Smith's house, activating the special response team, and searching for him in the woods surrounding his property could be considered "consciously disregard[ing], not just a substantial risk, but a great risk that serious harm would result." *Id.* at 155 (quoting *Ziccardi v. City of Philadelphia*, 288 F.3d 57, 66 (3d Cir. 2002)). Accordingly, the court affirmed the decision of the district court that had granted qualified immunity to the defendants with respect to the state-created danger claim brought by the plaintiffs.

b.    ***Neuberger v. Thompson***

In *Neuburger v. Thompson*, 305 F. Supp.2d 521 (W.D. Pa. 2004), *aff'd*, 124 Fed. Appx. 703 (3d Cir. 2005), the court held that an officer did not violate the constitutional rights of an armed,

---

[9] Smith was later found dead in nearby woods of cardiac arrest that one expert believed was brought on by the encounter with the police.

distraught individual when he approached her, drew his gun, and directed her to put her gun down.

She did not do so, and as the officers approached closer, she began pointing the gun towards one of

the officers, at which point he fatally shot her. In granting the officer's motion to dismiss, the court

explained:

> Plaintiff contends that, prior to the officers' approach, Ms. Neuburger was not presenting a threat to anyone in that she was sitting at the end of a 30-foot jetty, facing the Lake, with her feet in the water. By confronting Ms. Neuburger with drawn guns, shining a light upon her, and issuing commands, it is alleged, the on-scene officers unnecessarily and unreasonably provoked her. In essence, Plaintiff seems to criticize both the officers' decision to approach Ms. Neuburger and the manner in which their approach was carried out.[10]

> We cannot agree that the on-scene officers acted in an objectively unreasonable manner in determining to confront and disarm Ms. Neuburger. The complaint illustrates that [the officers] were dispatched to the scene after concerned witnesses had observed Ms. Neuburger acting distraught and firing a live round into the Lake. Upon their arrival, Ms. Neuburger continued to appear highly emotional and was crying unintelligibly. In light of these facts, the on-scene officers had probable cause to arrest Ms. Neuburger and/or take her into protective custody. Given Ms. Neuburger's highly emotional state and her possession of a loaded handgun, reasonable officers could have believed that Ms. Neuburger might cause harm to herself or possibly others. . . . Given all of the "unknown" factors confronting the on-scene officers, it was reasonable for them to conclude that affirmative action was appropriate in order to diffuse the situation as expeditiously as possible. Consequently, even though Ms. Neuburger was located at the end of a jetty and had no immediate

---

[10] As the court explained earlier in the opinion, "Plaintiff [] claims that the Troopers had time to attempt to 'wait out' Ms. Neuburger, employ a trained negotiator, or utilize other strategies or tactics in an attempt to apprehend Ms. Neuburger without the use of deadly force. It is alleged that the Troopers' failure or refusal to take these alternative measures and their decision to instead approach Ms. Neuburger in the manner described unnecessarily and unreasonably created circumstances under which deadly force was utilized." *Neuburger v. Thompson*, 305 F. Supp.2d 521, 525 (W.D. Pa. 2004) (citations omitted).

means of escaping, the officers acted reasonably in attempting to disarm and subdue her.

Moreover, the manner in which the on-scene officers approached Ms. Neuburger was not inappropriate under the circumstances. The four Troopers on scene did not constitute an overwhelming show of force, although Ms. Neuburger was the only individual with whom they ostensibly had to contend. Crediting Plaintiff's allegations as true, Trooper Barnes (the officer designated to speak to Ms. Neuburger) was not overly hostile or belligerent in his tone, as it is alleged merely that he "spoke to [Ms. Neuberger] saying, among other things, for her to put the handgun down" and "continued telling [her] to put her gun down." (Complaint at ¶¶ 22, 24.)

*Neuburger*, 305 F. Supp.2d at 528-29 (footnotes omitted).[11] *See also Neuburger v. Thompson*, 124 Fed. Appx. 703, 705 (3d Cir. 2005) (noting plaintiff's argument that the "encounter in this case was brought swiftly to a head and became confrontational only because the state police chose" to make it so, but observing that plaintiff was "[u]nable to cite any case holding conduct similar to the troopers' unlawful").

### c.     *Hogan v. City of Easton*

More recently, *Hogan v. City of Easton*, Civ. A. No. 04-759, 2006 WL 2645158 (E.D. Pa. Sept. 12, 2006) (Padova, J.), was litigated in this district. The action arose out of a standoff between the plaintiff and police officers at his house, which culminated in his non-fatal shooting. The plaintiff contended that the officers deprived him of his Fourth Amendment right to be free from

_____

[11] Exercising plenary review of the district court's dismissal order for failure to state a claim, the Third Circuit panel explained that "we generally agree with the District Court's thorough analysis," but found that the doctrine of qualified immunity provided "the clearest resolution for us of the issues raised on appeal." *Neuburger v. Thompson*, 124 Fed. Appx. 703, 705 (3d Cir. 2005). *See also id.* ("For the reasons explained by the District Court, Mr. Neuburger's arguments in support of a violation his wife's constitutional rights are unpersuasive. Moreover, even assuming that the facts alleged by Mr. Neuburger could establish a violation of constitutional rights, those rights were not clearly established.").

excessive force when they, *inter alia*, took a "confrontational stance" and constrained his freedom of movement in his own home, at a time when, he contended, there was no need for any force. Upon the officers' motion for summary judgment, the district court noted:

> [N]one of the authority cited by Plaintiffs supports the theory that lawful entry into a house, even when aggressively "stomping" on the floor in their boots and leaving their dogs to bark in the patrol cars, constitutes an unreasonable use of force when police are responding to a 911 call regarding a domestic disturbance involving an armed man. The first [] Officers to arrive on the scene knew that a 911 call had been placed regarding Mr. Hogan's behavior and quickly learned that Mr. Hogan had re-armed himself. The Officers asked to talk to Mr. Hogan; they did not threaten to shoot him, they said they just wanted to talk to him when he was not armed, and Officer Miller, the designated negotiator, had a "calm" voice, according to Mr. Hogan. Although [another officer] interjected, yelling at Mr. Hogan to put down his gun and using expletives, this type of conduct does not constitute excessive force as a matter of law in a situation where there is cause to believe the suspect is violent. The amount of force exhibited was proportionate to the situation. Accordingly, the Court finds that the police conduct prior to activating the SWAT Team was objectively reasonable under the *Graham/Sharrar* factors, especially given that the amount of force displayed was minimal.

*Hogan*, 2006 WL 2645158 at *13 (footnotes and citations omitted). The court also found that it was "objectively reasonable" for the officers to have had a SWAT Team present in light of the fact that "Mr. Hogan was armed and had fired a shotgun into the basement wall, continued to resist the [o]fficers, and threatened the safety of the [o]fficers and others." *Id.*

### d. *Morais v. City of Philadelphia*

Finally, just five months before the incident that led to Henry's death, our district rendered a decision in another case involving the City of Philadelphia Police Department's response to a mentally disturbed, barricaded person in *Morais v. City of Philadelphia*, Civ. A. No. 06-582, 2007 WL 853811 (E.D. Pa. Mar. 19, 2007) (Katz, J.). Mr. Morais suffered from chronic paranoid

24

schizophrenia. As a result of a deterioration in his condition, his case manager obtained a civil

commitment order and asked for police assistance in transporting him to a psychiatric hospital. Mr.

Morais became hostile when speaking with them at his apartment door and refused to let them in.

When officers attempted to unlock his door, he barricaded the door and ran a knife along the narrow

opening. Two hours into the standoff Mr. Morais threw a gallon-sized plastic jug out of the window

containing an unknown liquid. He did not, however, make any effort to come out of his apartment

nor did he threaten to harm the negotiators who had arrived. A short time later, SWAT officers

unlocked the door to his apartment and then used a battering ram to force it open. After gaining

entry, the officer holding the battering ram continued to run with it towards Mr. Morais at the other

end of the apartment, at which point Mr. Morais badly cut the officer on his fingers. The other

officers responded with a Taser and attempted to wrestle Mr. Morais's knives from him. When they

were unsuccessful, one of the officers fatally shot Mr. Morais. The court allowed the plaintiff's

claim of excessive force to go to trial with respect to the entry into his apartment, noting:

> Here, Decedent did not pose an immediate threat to the safety of the
> officers or others. Although Decedent was armed with a knife, he did
> not have the ability to harm any individual outside of his apartment,
> unlike the decedent in *[Estate of Smith v. Marasco*, 318 F.3d 497, 516
> (3d Cir. 2003)]* who had a gun. *See Id.*

> The court also notes that Defendants were attempting to
> involuntarily commit Decedent for the purpose of a mental health
> evaluation, a purpose of which was to protect the well-being of
> Decedent. Prior to the forced entry into his apartment, there is no
> evidence that Decedent had harmed anyone – only that he banged on
> the floor in response to barking dogs, exposed himself to pedestrians
> and threw objects out the window without hurting anyone.

*Morais*, 2007 WL 853811 at *5. *See also id.* at *7 (considering plaintiff's contention that officers'

actions in breaching the apartment "unreasonably created the need for the use of deadly force" and

25

suggesting that plaintiff has "potentially stated a Fourth Amendment violation for the shooting," yet finding that the claim could not be successful because the right was not clearly established).

Of these cases, only one — *Estate of Smith v. Marasco* — represents a controlling authority that could clearly establish a right for qualified immunity purposes. That case, however, served only to establish that it was a Fourth Amendment violation for the officers to have intruded upon the decedent's house and shed as they did with flash-bang devices and tear gas. None of the officers responding to the Henry home took this aggressive action or intruded upon the home. Moreover, the court in *Smith II* affirmed that reasonable officers confronted with the situation at Smith's house would not have had reason to believe, based upon the clearly established constitutional law up to that time, that establishing a perimeter and calling in a special-response unit would violate Smith's right to substantive due process. Similarly, we are hard-pressed to find that the officers at Henry's house would have had reason to believe that the actions of as many as three of them directing or inducing Henry to come out of the house could be unconstitutional, particularly when, even more so than in *Smith*, Henry was undoubtedly subject to arrest for assaults on several police officers.

To the extent that the other cases constitute persuasive authorities, we do not believe that they would lead a reasonable officer to believe that he would violate Henry's constitutional rights when he remained outside of the home and instructed him to put down his knife and surrender. Unlike the decedent in *Morais*, and more like the distraught or emotional persons in *Neuburger* and *Hogan* who had fired guns, Henry had harmed and sought to further harm a variety of people in the vicinity of the house that morning: he had run his mother out of the house and had thrown knives and tools at police officers either from the upstairs or when he went outside for a brief period. The police response was more measured than in *Hogan* or *Morais* and akin to that of *Neuburger* — which was

26

held to be objectively reasonable.  *See also Neuburger v. Thompson*, 124 Fed. Appx. 703, 705 (3d Cir. 2005) (noting plaintiff's argument that the "encounter in this case was brought swiftly to a head and became confrontational only because the state police chose" to make it so, but observing that plaintiff was "[u]nable to cite any case holding conduct similar to the troopers' unlawful").  In light of these precedents, we cannot agree with Plaintiffs that Officer Orth and Sergeants Bradshaw and Schiavone, to the extent that they communicated with Henry to encourage him to drop his knife and come out of the house, would have reasonably believed at that time that their actions might violate his constitutional right to be free from excessive force during the course of a seizure, nor would they have had reason to believe that their conduct might "shock the conscience" and deprive Henry of his substantive due process rights.  Neither precedents of the Supreme Court nor our Court of Appeals have established such a right in this factual context, nor have a consensus of cases of persuasive authority stood for this proposition.  Accordingly, we conclude that the alleged actions of Officer Orth and Sergeants Bradshaw and Schiavone on August 5, 2007 in "inducing" or "luring" Henry out of the house, while also telling him to drop his knife, did not violate a constitutional right of Henry of which a reasonable officer confronted with the situation on that date would have been aware.

### 2.    Other cases applying the qualified immunity analysis

Apart from our own assessment, as set forth above, as to the law that was (and was not) "clearly established" as of August 5, 2007, we have been guided by the qualified immunity analyses presented by other courts when addressing claims of state-created danger or excessive force in similar circumstances.  These cases further support our conclusion that the legal rationale most similar to that which Plaintiffs seek to advance has not, in fact, been clearly established and that summary judgment on qualified immunity grounds is thus appropriate.

In *Grazier v. City of Philadelphia*, 328 F.3d 120 (3d Cir. 2003), the plaintiffs alleged that police officers violated their Fourth and Fourteenth Amendment rights by shooting at them in the course of a traffic stop after the plaintiff driver attempted to pull away from the stop and in so doing drove towards one of the police officers.[12]  Although the officers' actions violated departmental policies concerning traffic stops, a jury ultimately found the officers not liable for any constitutional violations.  On appeal, the plaintiffs complained that the district court erred in not instructing the jury that an officer acts unreasonably in a constitutional sense if his improper conduct creates the situation making necessary the use of deadly force, citing to *Estate of Starks v. Enyart*, 5 F.3d 230, 234 (7th Cir. 1993) and *Gilmere v. City of Atlanta*, 774 F.2d 1495, 1501-02 (11th Cir. 1985) (*en banc*).  Reviewing the district court's instructions for plain error, our court of appeals responded:

> Our Court has not endorsed the doctrine discussed in *Gilmere* and *Starks* and, in fact, has recognized disagreement among circuit courts on this issue.  *See Abraham v. Raso*, 183 F.3d 279, 295-96 (3d Cir. 1999).  In *Abraham*, we announced that "[w]e will leave for another day how these cases should be reconciled."  *Id.* at 296.  In this context, the District Court did not abuse its discretion by refusing to instruct the jury on a doctrine that our Circuit has not adopted.  As such, plain error of course did not occur.

*Grazier*, 328 F.3d at 127.  The *Grazier* decision thus informs us that as of May 9, 2003, within the Third Circuit, allegedly improper conduct by an officer (albeit in a traffic stop) that creates the need to subsequently use deadly force would not constitute an independent violation of the individual's constitutional rights (under the Fourth Amendment).

---

[12]  The incident seemed to highlight the importance of avoiding making traffic stops in a manner in which the driver might mistake the police officers for carjackers.  The officers were dressed in plainclothes and driving an unmarked car.  They swung their car in front of the plaintiff to cut him off and then approached him with guns drawn.  They did, however, display their badges. *Grazier*, 328 F.3d at 122-23.

A few years later, in March of 2007, and as discussed *supra*, the district court in *Morais* appeared inclined to find a Fourth Amendment violation resulting from the fatal shooting of Mr. Morais that followed upon the storming of his apartment by members of the Philadelphia Police Department SWAT team. The court characterized the "[p]laintiff's primary contention [as] that the Defendants' actions in breaching the apartment unreasonably created the need for the use of deadly force." *Morais v. City of Philadelphia*, Civ. A. No. 06-582, 2007 WL 853811, *7 (E.D. Pa. Mar. 19, 2007).[13] It suggested that the plaintiff had "potentially" stated a viable Fourth Amendment claim under the theory that the officers' actions in entering his apartment as they did — which the plaintiff characterized as reckless and in violation of police policy — unreasonably created the need for deadly force. The court concluded, however, that "such a theory was not clearly established law." *Id.* at *7.[14] The court noted, as had the *Grazier* court, that the Third Circuit in *Abraham v. Raso* had "deferred deciding 'for another day' whether a police officer's actions that create the need for deadly force may establish a Fourth Amendment violation." *Id.* at *8 (citing *Abraham v. Raso*, 183 F.3d 279 (3d Cir. 1999)). The court also cited to *Grazier* and that court's recognition of the fact that "the Third Circuit has not endorsed an approach that an officer acts unreasonably if his improper conduct creates the situation making necessary the use of deadly force." *Id.* at *8 (describing *Grazier v. City of Philadelphia*, 328 F.3d 120, 127 (3d Cir. 2003)). In addition, the *Morais* court noted that "[t]he circuits that have addressed this issue have reached different conclusions." *Id.* (comparing a Fourth

---

[13] The court recognized that, once the confrontation was underway inside the apartment, Mr. Morais posed an immediate threat to the safety of the SWAT team and that his conduct thus provided adequate justification for the use of deadly force.

[14] The officers' conduct in *Morais* was being judged as of February 19, 2004, the date of the incident giving rise to that case.

and a Fifth Circuit case with that of a Seventh Circuit case, all in the context of a seizure using deadly or excessive force following upon a negligently or improperly executed stop or arrest).  The *Morais* court concluded:

> Thus, as the Third Circuit has not yet adopted this approach, and other circuits have disagreed about its application, it cannot be said the officers violated a clearly established constitutional right.  *See Neuberger v. Thompson*, 124 Fed. Appx. 703, 706-07 (3d Cir. 200[5]) (applying the same logic in holding that Plaintiff's claim that the police officers' actions created the need for deadly force did not state a violation of a clearly established constitutional right).  Thus, regardless of whether such conduct constituted a violation of Decedent's Fourth Amendment rights, the claim must be dismissed against all individual Defendants on the basis of qualified immunity.

*Morais*, 2007 WL 853811 at *8.  *See also Neuberger v. Thompson*, 305 F. Supp.2d 521, 534 (W.D. Pa. 2004) (finding, in alternative holding, that body of Fourth Amendment jurisprudence was not "sufficiently developed as of August 18, 2001 such that reasonable officers in the position of [the defendants] would have understood their conduct to be unlawful" when they attempted to disarm and subdue distraught person at lake park who had already fired shot).

Since *Grazier*, which was issued on May 9, 2003, and the Third Circuit's decision in *Neuberger*, which was issued on January 5, 2005 but was non-precedential, our Court of Appeals has not answered the question left open by *Abraham v. Raso* in 1999.  As a result, we cannot say that, as of August 5, 2007, the notion that an officer violates an individual's constitutional rights if he engages in conduct that unreasonably or unnecessarily increased the likelihood that significant force would be applied against the individual was a constitutional right that was "clearly established" by virtue of controlling case law in the Third Circuit.  *See Wilson v. Layne*, 526 U.S. 603, 617 (1999) (observing that controlling authority in the relevant jurisdiction can identify a clearly established

30

right). Nor do we find that a consensus of cases of persuasive authority had embraced this notion as of the relevant date as to have had the effect of "clearly establishing" it for purposes of the qualified immunity analysis. *See id.* (describing a consensus of persuasive authority as a means of clearly establishing a right). Rather, the notion that a Fourth Amendment violation may be found based upon an officer's role in creating the need for force appears to have been endorsed as of August 5, 2007 only by: (1) Judge Becker of the Third Circuit Court of Appeals, in his 2003 *Grazier* dissenting opinion; (2) Judge McLaughlin of the Western District of Pennsylvania, in the 2004 *Neuberger* district court opinion, in which he accepted the potential viability of such a claim but ultimately found that the allegations plead in the complaint failed to state a claim; (3) by Judge Katz of this Court, in the 2007 *Morais* decision, in which he found that the plaintiff had "potentially stated a Fourth Amendment violation for the shooting" but granted the defense summary judgment motion on qualified immunity grounds; and (4) as alluded to by Judge Becker in his *Grazier* dissent, a panel of the Seventh Circuit and a divided Eleventh Circuit *en banc*. *See Estate of Starks v. Enyart*, 5 F.3d 230, 234 (7th Cir. 1993) (officer jumped in front of decedent's vehicle in attempt to apprehend him and created need for deadly force; court notes that "[p]olice officers who unreasonably create a physically threatening situation in the midst of a Fourth Amendment seizure cannot be immunized for the use of deadly force"); *Gilmere v. City of Atlanta*, 774 F.2d 1495, 1501 (11th Cir. 1985) (*en banc*) (a majority of a divided court affirmed judgment for plaintiff against officer whose beating of plaintiff provoked the resistance that resulted in the application of deadly force; court notes that "[a] moment of legitimate fear should not preclude liability for a harm which largely resulted from [an officer's] own improper use of his official power").

### 3.     Qualified immunity: conclusion

Having surveyed the case law, we are not persuaded that Henry had a clearly established right as of August 5, 2007 to be free of instructions by officers to drop his knives and come outside, where the officers sought to disarm and subdue him at a time when he was subject to arrest for his earlier assaults on officers and notwithstanding the fact that department policy instructed them to leave such tactics to colleagues in a specialized unit.  In reaching this conclusion, we note that Judge Katz found that the notion that persons have a constitutional right to be free from unreasonable conduct that creates the need for the use of deadly force was not "clearly established" as of February 19, 2004, the date of the incident in the *Morais* case.  The subsequent decisional law, including the suggestions of the district courts in *Morais* (Eastern District) and *Neuburger* (Western District) that the plaintiffs in these cases had "potentially" stated a viable claim, or that they would be inclined to recognize such a right, would not have served to make it sufficiently clear to Officer Orth and Sergeants Bradshaw and Schiavone that they were violating Henry's rights when they allegedly unnecessarily and unreasonably instructed him to drop his knife and come out of the house.

Because Plaintiffs have not established that any conduct of Officer Orth or Sergeants Schiavone or Bradshaw in directing Henry to emerge from the house violated a clearly established constitutional right, these officers are entitled to summary judgment on the basis of qualified immunity as to the Section 1983 claims against them relating to paragraphs 66-68 (Orth), 81-83 (Bradshaw),[15] and 96-98 (Schiavone) of the Amended Complaint.

---

[15] With the exception of the excessive force claim discussed earlier relating to use of the Taser.

## VI.    CONCLUSION

In claims such as these involving police response to a difficult situation, the facts and circumstances giving rise to the exercise of force by the police are what determine whether or not their actions are unreasonable and therefore prohibited by the Fourth Amendment and whether their other acts or omissions might be sufficiently conscience-shocking to violate the Due Process Clause. A significant material fact in the analysis here is whether Henry brandished a knife when, in response to the officers' requests and orders, he stepped out of the house. That fact is in dispute. This Court is not in a position to assess in any way the credibility of the proponents of the different accounts. That task will be for a jury. As the situation lends itself to a variety of different legal conclusions based upon the various factual findings that could reasonably be inferred from the summary judgment record, we find that it is not appropriate to award summary judgment on the Fourth Amendment claims contained in Counts I, II, V and VI as to Sergeant Bradshaw for use of the Taser and Officer Zorawski for the fatal shooting.

As to the claims against Officer Orth and Sergeants Bradshaw and Schiavone pertaining to commands given to Henry to put down his weapons and come out of the house, we find that the doctrine of qualified immunity protects them from liability. When considering the various cases that have passed judgment upon the conduct of officers in situations like that presented at the Henry house — whether considering the issues from the perspective of the Fourth Amendment, the Due Process Clause, or a combination of the two — we do not find the state of the law on August 5, 2007 to be such that they, or any reasonable officer, would have perceived that their actions violated Henry's constitutional rights. Under the standards governing the qualified immunity defense to

33

Section 1983 claims, therefore, they are entitled to summary judgment as to these particular claims against them.

An appropriate Order follows.